266 N.J. Super. 283 (1993)
629 A.2d 110
EILEEN T. QUIGLEY, INC., PLAINTIFF-APPELLANT, THIRD PARTY PLAINTIFF-APPELLANT,
v.
MILLER FAMILY FARMS, INC., CLEMENT E. MILLER AND NANCY MILLER, DEFENDANTS-RESPONDENTS,
v.
CHELSEA TITLE & GUARANTY COMPANY, THIRD PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 18, 1992.
Decided July 15, 1993.
*287 Before Judges KING, LANDAU and THOMAS.
Lori C. Greenberg argued the cause for appellant (Portner, Greenberg & Assoc., attorneys; Henry N. Portner and Lori C. Greenberg, on the brief).[1]
Barry W. Rosenberg argued the cause for respondents.
Sally E. Heckeroth argued the cause for Third Party Defendant on the counterclaim, Chelsea Title & Guaranty Company (Horn, *288 Goldberg, Gorny, Daniels, Paarz, Plackter & Weiss, attorneys; Mark Soifer and Ms. Heckeroth, on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
We consider and resolve today two separate but related appeals which concern a dispute about rights of defendants-respondents, Miller Family Farm, Inc., Clement E. Miller and Nancy Miller (Miller), to use private roadways within a mobile-home park conveyed to plaintiff-appellant, Eileen T. Quigley, Inc. (Quigley) by Miller, and a title insurance claim arising therefrom.
Quigley complained that Miller trespassed after the conveyance and sought an injunction against its continuance. When Miller claimed an easement through the Quigley property, Quigley sought to hold Chelsea Title & Guaranty Company (Chelsea), its title insurance carrier, responsible for costs of defending against the easement claim, and also requested indemnification for damages in the event its property was held subject to an easement.
By complaint and order to show cause in the Chancery Division on March 19, 1990, Quigley sought to enjoin continued use of its internal roadways by trucks and farm equipment moving to and from Miller's non-contiguous berry farm. Miller answered, asserting inter alia, defenses of equitable estoppel, laches, and both public and private easement rights. It also counterclaimed, contending that because absence of the easement would render its farm effectively landlocked, it had sought and received from Quigley both express and implied agreement to retain a right-of-way through the trailer park it conveyed.
Quigley amended its complaint to assert a trespass count, amended its answer to the counterclaim as amended, and filed a third-party complaint against Chelsea Title and Guarantee Company (Chelsea), whose assets and liabilities were acquired by Chicago Title Insurance Agency (Chicago) on December 17, 1990.
*289 On December 20, 1990, following Chelsea's earlier default and a proof hearing on the third-party complaint, an order was entered requiring Chelsea to reimburse Quigley for its legal fees and costs to defend, as well as for the decrease in value which "may result ... should subsequent litigation in this matter reveal the existence of such easement." Shortly before trial on the principal complaint and counterclaim, Chelsea moved to vacate this order. Decision on the motion was reserved.
On September 26, 1991, following trial in the Chancery Division, the judge rendered an opinion which held that there was no express or implied easement established, but that Quigley's representative, William Gelinas, had orally agreed that the internal roadways would be regarded as public roads open to Miller. The judge denied the injunctive relief requested by Quigley and instead ordered that it was "estopped and enjoined" from precluding Miller, its agents, servants and employees from using roads and trails within the Quigley property in order to gain access to the Miller farm. However, Miller's relief was expressly limited to such time as Quigley and the individual Miller defendants continued to own their respective lots, and was to terminate "in the event that either Plaintiff or the Defendants, Clement Miller and/or Nancy Miller, cease to own their respective lots." This ruling was embodied in a judgment dated October 10, 1991.
Thereafter, an appeal having been filed, we entered a limited remand to permit resolution of the reserved motion on the third-party complaint respecting Chelsea. On March 13, 1992, the trial judge entered an order which vacated the December 20, 1990 default order, and adjudicated that Quigley's third-party complaint was dismissed with prejudice and without costs.
Quigley appeals from the October 10, 1991 judgment, and the March 13, 1992 order dismissing its third-party complaint against Chelsea. We reverse the judgment for Miller, and affirm the dismissal as to Chelsea.

*290 Facts Underlying The Principal Claim

The Miller-Quigley title closing took place at Chelsea's office. Neither the closing statement (statement of settlement) signed by the parties nor the deed makes reference to any easement. The stated purchase price in both documents is $1,000,000.
Quigley is a corporation created solely for the purpose of acquiring the Miller mobile home facility known as Oakview Park[2]. Its shares are owned by a trust for the benefit of Eileen F. Quigley administered by William Gelinas, who negotiated the deal.
Gelinas testified that despite the existence of several unexecuted draft agreements, (one for $500,000; one for $600,000; one for $1.1 million), no contract was fully accepted and executed prior to the sale. The draft $1.1 million contract contained no provision for an easement. According to Gelinas, he was aware that Miller wanted to retain an easement for use of the Oakview roads. The $500,000 and $600,000 drafts were "the other side of the coin", enabling Miller to retain an easement. Thus, Gelinas testified, the $1,000,000 price finally fixed reflected Gelinas' unwillingness to allow the easement without a very substantial reduction in the purchase price.
Miller was represented at closing by an attorney, Lewis Farsetta. Gelinas, although not an attorney, attended the closing alone. He testified that there were no easement or right-of-way discussions at the closing; that he asked Farsetta for a certificate of title; and that he received and relied upon a Corporate Title Affidavit given to him at that time, which represented that the land was not subject to any easement or encumbrances. He took this to include the easement which was the subject of their negotiations.
*291 It appears that the roadways within the mobile home park are not the only means of access to the Miller farm. Red Onion Road, however, the principal alternate route pointed to by Quigley and considered by the court, is very narrow and rutted, making its negotiation difficult for heavy trucks transporting cranberries. That route would also take much longer to access the Miller farm. Its impassability was disputed at trial, but the judge found that it would require improvement with fill to become passable by "normal vehicles." Although maintained by the Township, the road is not municipally owned. In fact, Red Onion Road may cross other private property as well as State forest land.
The internal Quigley roadways, however, also do not directly abut the Miller farm. Rather, they allow access to dirt roads within State forest lands through which farm access is gained. We note that mention was made below of a third farm access possibility, across land of a consenting owner.
After closing, when Quigley took possession of Oakview, Miller continued to move its trucks through the trailer park to the dirt road in the State forest which led to the farm. Gelinas testified that when he raised objections to this, he experienced problems getting approval from Shamong Township for the trailer park operation:
... Shamong is a one-party town and there's only three people on the Board, and Mr. Miller's the Senior Councilman, and they wouldn't grant us the license. They wouldn't transfer the license, although we met all the requirements of the bond and everything that's in the statement. They just wouldn't do it. And it seemed to be a positive correlation. Every time I said don't put that  those big trucks down that road, bingo, I would get this response, negative response from the Township.
Gelinas said he delayed bringing formal action to stop the trespassing because, "You're walking on thin ice down there at that Township and I didn't dare. I didn't dare."
By contrast, Farsetta testified that "the parties had agreed inter se that the right  the mutual[3] rights of ingress and egress *292 were to continue." Accordingly, he testified, the corporate title affidavit provided by Miller was intended only to apply to prior adverse claims by third parties but not to the seller's rights of access.
Farsetta said he put no language reserving a right of way or easement in the deed because Gelinas had previously expressed concern about easement language clouding Quigley's title, and had stated that "Miller had every right to use the public roads, which he considered to be public roads, to get to his blueberry farms." Testimony by Miller family members also tended to show that the property would not have been conveyed without a provision for farm access.

The Chelsea Title Insurance Matter
On October 3, 1989, Quigley's insurance agency wrote a letter to Chelsea, its title insurer, requesting "assistance in stopping [Miller's] trespassing" and advising that the letter constituted "a formal notice of claim for damages." Quigley's lawyer then wrote to Chelsea on October 3, 1989, referring to the "formal claim" previously made under the policy by reason of Miller's assertion of a retained easement after title was passed. The letter demanded that Chelsea "take whatever action is necessary to see that the easement is either declared to have been non-existent; or in the alternative to see that it is extinguished and that we are reimbursed for the damages suffered by the use of that easement."
Finally, Quigley's lawyer advised Chelsea that, absent a response within ten days, suit would be brought independently and reimbursement for its costs would be sought from the title insurer. There is no indication of any response, even after suit was brought, until Chelsea's successor in interest, Chicago Title, secured vacation of the default judgment and dismissal of the Quigley third party complaint, after entry of judgment for Miller. On March 31, 1992, Quigley appealed from this order of dismissal.
*293 Quigley here argues that the default should not have been vacated and its third party complaint should not have been dismissed.
The trial judge stated: "... in vacating the default I necessarily have found that the claim in the counterclaim does not assert an insurable event ..." and so dismissed the third party action "because there is no duty alleged in the counterclaim as an insurable event which would require the insurer to come in and defend." Quigley says this was error in that there was no motion for judgment then pending, there was no chance for discovery, and that the policy should have been construed to provide coverage. Quigley also urges that Chelsea's failures to respond to its inquiries or respond to the Miller counterclaim should bar its defenses because of estoppel and laches.
We are satisfied that vacating the default was proper under the broad discretion afforded by R. 4:43-3. See O'Connor v. Altus, 67 N.J. 106, 129, 335 A.2d 545 (1975). Although Quigley's brief now argues that the December 20, 1990 order was a "default judgment" and the procedural history in Chelsea's brief also refers to a "default judgment," the record on the March 13, 1992 proceedings clearly indicates that both counsel then agreed with the judge that the December 20 order was merely an order of default and not a default judgment.
Although Chelsea should have made a formal motion for dismissal following entry of judgment in favor of Miller, we find this to be harmless error in that the judge correctly laid the policy and the complaint side by side (see Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 388, 267 A.2d 7 (1970)), and concluded that Chelsea had no duty to defend Quigley against Miller's counterclaim grounded in an easement alleged to be created by Quigley's knowledge and conduct, or by an alleged "omission" from the deed. The Chelsea policy indisputably and unambiguously excluded insurance against "[e]asements or claims of easement, not shown by the public record," as well as against title defects or adverse claims known to the insured, but not known to the *294 insurer. In consequence, as no insurable event was alleged in the counterclaim, and no insurable event was established at trial, no duty to defend or indemnify devolved upon Chelsea. See also, Sylvania v. Stein, 177 N.J. Super. 117, 124, 425 A.2d 701 (Ch.Div. 1980).
Chelsea's initially casual treatment of Quigley's notification (perhaps attendant to the acquisition by Chicago) may have been less than businesslike. However, in light of the absence of any duty for Chelsea to defend or indemnify, or any detrimental reliance by Quigley upon a Chelsea indication that a defense would be provided, we see no basis for reversing the dismissal of Quigley's third party complaint against Chelsea.

Miller-Quigley Dispute
We begin by recognizing that the court, conscious that Miller had not satisfied the elements and evidential standards required to establish an express, implied or prescriptive easement (see Leach v. Anderl, 218 N.J. Super. 18, 24-30, 526 A.2d 1096 (App.Div. 1987)) specifically found that no easement, implied, express or prescriptive had been created. Interests in land must ordinarily conform to the requirements of the Statute of Frauds. N.J.S.A. 25:1-1. Exceptions to this policy which permit establishment of implied easements must be established by proofs which are clear and convincing as to all elements. Pilar, Inc. v. Lister Corp., 38 N.J. Super. 488, 498-500, 119 A.2d 472 (App.Div.), aff'd, 22 N.J. 75, 123 A.2d 536 (1956); Leach v. Anderl, supra, 218 N.J. Super. at 26, 526 A.2d 1096.
The judgment and order in this case, although not phrased in terms of implied or express easement, nonetheless created an enforceable right to use Quigley's internal roads by enjoining Quigley from interfering with such use. This was done without necessity for a writing (N.J.S.A. 25:1-1), and free of the consequences of the general rule that following acceptance of a deed by the purchaser, respective rights and liabilities of the parties thereto are to be determined solely by the deed. See, 13A N.J. *295 Practice, Real Estate Law and Practice, Section 24.49 at 67 (Celemtano) (1991). Collateral covenants survive delivery of a deed only if they have no relationship to title, possession, quantity or emblements of the land. Urban Farms, Inc. v. Seel, 87 N.J. Super. 177, 208 A.2d 434 (Ch.Div. 1965), aff'd, 90 N.J. Super. 401, 217 A.2d 888 (App.Div. 1966).
A parol consent to enter upon land amounts only to a license. While a ruling creating a license may be made free of the Statute of Frauds, the license necessarily is subject to the condition that it can be at any time revoked. Hetfield v. Central R.R. Co., 29 N.J.L. 571, 573 (E & A 1862). "No principle is better settled ...". Ibid; see N.J.S.A. 25:1-1.
Here the trial judge sought to create a form of equitable hybrid, a right personally enforceable by the Millers as long as they owned their farm property, and not terminable by Quigley unless it gave up the acquired property.
The trial judge, evidently concluded that the elements of an estoppel were met because he believed the testimony of Farsetta and the Millers. Findings by a trial judge are ordinarily binding upon us where supported by adequate, reasonable and credible evidence. See, Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 323 A.2d 495 (1974).
However, where a finding runs counter to a policy embodied in the Statute of Frauds, and equitable relief is based upon reasonable reliance on representations of the promisor  a form of promissory estoppel  rather than on the theory that part performance is a substitute for the requisite writing, proof of such promise, the proofs which establish such conduct and reliance must be of a "clear and convincing" or "clear and unequivocal" quality. Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 163-164, 165 A.2d 531 (App.Div. 1960). A similarly enhanced evidential standard must be applied in cases in which it is urged that an estoppel has arisen because the paramount title owner has knowingly and silently permitted a party to spend money on real estate improvements *296 under a mistaken belief that it has a property right. See, Aiello, supra, 64 N.J. Super. at 163, 165 A.2d 531; Bridgewater v. Ocean City Ass'n, 85 N.J. Eq. 379, 387, 96 A. 905 (Ch. 1915), aff'd, 88 N.J. Eq. 351, 102 A. 1052 (E & A 1917), aff'd, Riley v. Ocean City Ass'n, 88 N.J. Eq. 352, 102 A. 1053 (E & A 1917). Among the classes of cases to which this enhanced proof requirement has been applied are suits to enforce oral contracts respecting land, and proceedings to reform or modify written transactions. See, McCormick on Evidence, Section 340 (Lawyer's edition, 3d. ed., 1984).
Thus, in creating and addressing the estoppel issue (it was not raised by either party below) the trial judge should have employed the clear and convincing evidential standard in making his findings. There is no indication in the opinion that this was done. Moreover, upon reading the record, we conclude that it falls far short of fulfillment of that standard.
However categorized, and despite ostensibly being made personal to the parties by the court order, the kind of interest afforded to Miller by the injunctive order materially interferes with Quigley's right to unencumbered title and peaceable possession, while it or Miller own their respective parcels. This is not the kind of collateral personal covenant enforced in Urban Farms, Inc. v. Seel, supra. Moreover, assuming that the type of interest created could survive merger-by-deed analysis, the basis for its creation still fails to meet the clear and convincing evidence test.
Equitable estoppel requires proof of misrepresentation of material facts, or concealment thereof, known to the party sought to be estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and upon which the other party reasonably and justifiably relies, to its detriment. Foley Machinery Co. v. Amland Contractors, Inc., 209 N.J. Super. 70, 75, 506 A.2d 1263 (App.Div. 1986).
*297 In appraising the issues of reasonable and detrimental reliance, the trial court had to find by clear and convincing evidence that Gelinas agreed to permit Miller to access the State forest road leading to the Miller farm with trucks and heavy farm equipment using the roads of the trailer park conveyed to Quigley by Miller as "public ways", despite the absence of any written reservations in the deed or closing documents, or evidence of dedication. The judge also had to believe that Miller's attorney, the only lawyer at the closing, expressly or inferentially determined and advised his clients that no writing was necessary in light of such an oral agreement by Gelinas, the administrator of Mrs. Quigley's trust estate. Finding this, the judge further had to determine that such advice and reliance thereon by the Millers upon such advice was reasonable, as well as detrimental. Foley, supra; Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 345-350, 206 A.2d 899 (App. Div.), certif. den., 44 N.J. 399, 209 A.2d 139 (1965).
We are ordinarily reluctant to disturb findings of fact by a trial court, as exemplified by the Rova Farms standard quoted above. However, we are constrained to do so here because the trial judge did not utilize the clear and convincing standard of proof which we hold to be requisite in this case, and because our review of the record convinces us that the Miller proofs do not satisfy that exacting standard.
Even making allowances for the court's superior opportunity to evaluate credibility, we question whether this tale of counseled reliance upon a business stranger's oral representations on a matter purportedly critical to the sellers, only to accommodate the purchaser's desire to avoid a cloud upon its title, survives scrutiny even under the lesser preponderance of evidence test.
"Testimony to be believed must not only proceed from the mouth of a credible witness but must be credible in itself. It must be such as the common experience and observation of mankind can approve as probable in the circumstances." In re Perrone's Estate, 5 N.J. 514, 522, 76 A.2d 518 (1950); Abeles v. Adam *298 Engineering Co., 64 N.J. Super. 167, 183, 165 A.2d 555 (App.Div. 1960), mod., 35 N.J. 411, 173 A.2d 246 (1961).
Putting aside the lawyer's apparent disregard for the formalities which ordinarily attend reliance upon a corporation's undertaking (see, e.g., Abeles, supra), it is difficult for us to regard without some skepticism testimony by Miller's attorney which suggests that he relied upon, and counseled reliance upon, a mere oral representation in the face of the doctrine of merger by deed and the Statute of Frauds. Offsetting this questionable, though critical, evidence were proofs which tended to show that Quigley agreed to double its initial offer (evidenced by draft contracts presented to the court) only upon the understanding that the property would not be burdened with rights of access for farm trucks and equipment through the trailer park. We note, too, that no findings were made respecting Gelinas' testimony that Clement Miller used his dominant official position in the small community to induce Quigley's initial restraint in opposing his use of the internal roads for farm access by influencing the local regulatory process respecting the trailer park.
It is black letter law that "acceptance of a deed for lands is to be deemed prima facie full execution of an executory contract to convey, unless the contract contains a covenant collateral to the deed." Caparrelli v. Rolling Greens, Inc., 39 N.J. 585, 590-591, 190 A.2d 369 (1963), and authorities there cited. See also, N.J. Practice, Real Estate Law and Practice, supra, Section 24.49 at 67. The test for the rule of merger, "which extinguishes all previous covenants which relate to or are connected with the title, position, quantity or emblements of the land" is whether the alleged collateral agreement[4] is in fact connected with the title, possession, quantity or emblements of the subject property. Id. *299 The agreement asserted, which gave rise to the court's finding of estoppel, fits this test.
We hold that the creation of an enforceable right to enter and cross the land conveyed was error in this case. Although not so articulated, the decision below purported to create something less than an interest in land; a kind of license by equitable estoppel, incapable of revocation by the licensor without divesting itself of the real property acquired from the licensee. This, we hold, is more than a mere license. By depriving the owner of the land of the power to revoke without conveying its property, the court has created a kind of real property interest which partakes of most of the incidents of an implied easement, which the court specifically found not to exist.
Here, the hybrid interest adjudged to have been created by conduct giving rise to an estoppel arose in connection with an otherwise routine conveyance, made with a title affidavit representing that there are no easements or encumbrances, evidenced by a deed with covenants and no easement reservations, and given by a lawyer  represented grantor. We will not give judicial sanction to circumvention of the important policies of merger by deed and the Statute of Frauds, absent compelling and clearly and convincingly established proof of the elements of equitable estoppel.
Those proofs are not here present. Neither is there the requisite demonstration of irreparable injury necessary for injunctive relief, in light of the alternate access possibilities which appear to be available with some remedial clearing and filling action. Accordingly, we reverse the judgment for Miller and hold that Quigley is entitled to the benefits of its deed, as written, and without the burden of any rights of access across the property conveyed.
The judgment below is reversed, except as to the order respecting Chelsea Title, which is affirmed. We remand to the Chancery Division for further action consistent with this decision.
NOTES
[1] Subsequent to oral argument, a substitution of attorney was filed replacing Kozlov, Seaton, Romanini & Brooks for Portner, Greenberg & Assoc. as attorneys for plaintiff. Said substitution was consented to by the parties.
[2] Oakview was owned and conveyed by Oakview Mobile Home Estates, Inc., a wholly owned subsidiary of the Miller's corporation.
[3] Quigley asserted no rights to access Miller's farm property, nor were any conveyed.
[4] Here, a right of access across the property conveyed to a State forest path which led to non-contiguous farmlands owned by shareholders of the grantor corporation, notwithstanding probable availability of alternate access.