**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2668-17T2

K.R.,[1]

      Plaintiff-Respondent,

v.

J.H.,

      Defendant-Appellant.

_____

           Submitted December 19, 2018 – Decided March 4, 2020

           Before Judges Fuentes and Moynihan.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1047-18.

           Roberts & Teeter, LLC, attorneys for appellant (Michael B. Roberts, on the brief).

           Respondent has not filed a brief.

      The opinion of the court was delivered by

---

[1] We use initials to identify the parties to protect the confidentiality of these proceedings. R. 1:38-3(d)(10).

FUENTES, P.J.A.D.

In this appeal, the Chancery Division, Family Part found defendant J.H. committed an act of domestic violence against plaintiff K.R., by spraying mace directly into K.R.'s face. J.H. filed her own complaint against K.R. alleging K.R. held a knife to her throat. Both parties obtained temporary restraining orders against each other and appeared pro se at the hearing scheduled by the court to determine whether final restraints should be entered. Neither party requested an opportunity to retain nor consult with counsel before proceeding.

The Family Part hearing was based entirely on the parties' testimony. At the conclusion of the hearing, the judge found K.R.'s testimony credible and J.H.'s testimony not credible. The judge entered a final restraining order against J.H. and dismissed her complaint against K.R. J.H. is represented by private counsel in this appeal. K.R. opted not to participate. J.H. now argues in this appeal that she was denied her right to counsel and the Family Part judge committed reversible error by not advising her of the consequences of a final restraining order. She also argues that the Family Part judge did not properly consider her self-defense, defense. We disagree and affirm.

At all times relevant to this case, K.R. and J.H. were two young women who shared an apartment as co-tenants and thus met the definition of "household

A-2668-17T2

members" under the Prevention of Domestic Violence Act, (PDVA), N.J.S.A. 2C:25-17 to -35. See N.J.S.A. 2C:25-19d. On December 16, 2017, K.R. filed a domestic violence complaint against J.H. alleging simple assault as the predicate offense. N.J.S.A. 2C:12-1a(1). Specifically, K.R. alleged she and J.H. were in the midst of a verbal dispute about who was responsible for cleaning the apartment when J.H. sprayed K.R. "in the face, eyes, and neck with mace." The assault occurred in K.R.'s bedroom. Based on this allegation, the court granted K.R. a temporary restraining order (TRO) against J.H. The TRO enjoined J.H. from returning to the apartment and from having any contacts with K.R.

On January 10, 2018, J.H. filed a domestic violence complaint against K.R. The appellate record does not include a copy of J.H.'s domestic violence complaint. Both complaints came before the Family Part on January 12, 2018, for an evidentiary hearing to determine whether the parties were entitled to final restraining order (FRO). The parties appeared before the court pro se. The judge addressed both parties directly and explained how each case would proceed. K.R. would proceed with her case first. The judge said K.R. would tell the court three things: (1) "what happened on the day in question"; (2) whether J.H. had committed "any prior acts of domestic violence"; and (3) why K.R. "believes she needs the protection of the final restraining order."

With respect to J.H., the judge explained that she had the right to a defense and to tell the court "why the final restraining order should not be entered." As a plaintiff in her case against K.R., the judge told J.H. she would testify and tell him "the three things . . . I've just mentioned . . . what happened; whether or not there's any prior acts of domestic violence; and why she needs the protection of the final restraining order." The judge swore in the parties and proceeded in the manner he described.

According to K.R., the incident that formed the basis for the TRO occurred on December 16, 2017, when J.H. sent her "a rude text message about the trash not being thrown out." When K.R. explained that she had been out for the past two days working a double shift, J.H. responded in a rude and unsympathetic manner. K.R. testified that she returned to the apartment to take out the trash, wrote J.H. a note, and left money to pay the public service bill in J.H.'s bedroom. At one point, J.H. came into K.R.'s bedroom, threw the note at her, and "started talking about a sweater that she claims I stole[.]" According to K.R., this prompted a heated verbal dispute in which J.H. allegedly told K.R. that "my mother doesn't love me . . . just random stuff."

K.R. testified that at this point the verbal dispute escalated into physical behavior on J.H.'s part that ultimately ended in an assault.

4

And she grabbed my purse and flipped it upside down. And I was just sitting on my bed, like, talking to my friend. And I asked her to please leave my room, or I would call the cops. She didn't leave. So, I called the cops.

Then, she came back and she maced me in my face. And I -- I never once, like, threatened her. I didn't get up. Nothing. Like, I was just sitting on my bed. And –

THE COURT: Okay. And when . . . what time did that happen?

K.R.: I want to say around twelve o'clock on December 15, [2017].

THE COURT: Did you get any medical treatment?

K.R.: I -- the paramedics came. And they just -- they really couldn't do much except have me stand under cold water.

At the conclusion of her testimony, the judge asked K.R. "[w]hy do you believe you need the order?" K.R. responded: "Because I don't [feel] safe. And this is the second time it's occurred. And she did it with absolutely no problem. Who's to say it won't get worse next time? I just don't want there to be a next time. And I want to feel safe in my home."

The judge explained to J.H. that she had the right to question K.R. about any matter related to her testimony. To make sure she understood the concept of cross-examination, the judge told J.H. this was her opportunity "to poke

A-2668-17T2

holes" in K.R.'s testimony.  The judge also made clear that she had a right to
testify in her own defense.

> THE COURT:  We're still at the part where, if you want
> to, you have the right to ask questions of the plaintiff.

> J.H.: I don't want to ask any questions, I just want to
> tell my side.

J.H. testified that a month after K.R. moved into the apartment she "started
to see her, like, true colors.  She had, like, a very bad temper.  She got very
angry, if I ever asked her to, like, pay the wi-fi bill, pay the electric bill."  The
bulk of J.H.'s testimony focused on K.R.'s alleged cantankerous demeanor.  The
judge finally asked her to address the allegation made by K.R.

> THE COURT: [C]an you get to the allegation? She's
> saying that you maced her.  You used mace and sprayed
> it in her face.

>         . . . .

> J.H.: When I came to her bedroom, I showed her the
> note, that is not what's sitting in front of me. But, when
> I asked her about it, she said, "Get out of my room. I'm
> going to call the cops." I asked her for my sweater back.
> She called the police. And, then, after she called the
> police, she held a knife to me. And I maced her.
>         . . . .

> THE COURT: [S]he . . . used the word mace, but pepper
> spray or mace, and sprayed it in her face.

>         . . . .

A-2668-17T2

That's . . . the claim.

J.H.: In defense.

THE COURT: Do you have a response to that?

J.H.: Yes, sir.

THE COURT: [W]hat is your position with regard to that allegation?

J.H.: Yes. I maced her in defense.

THE COURT: In . . . defense of what?

J.H.: Her holding a knife to my throat.

When K.R. asked her on cross-examination why she did not say anything about the knife to the police officers who responded to the apartment, J.H. claimed the officers did not ask for her side of the story. Finally, when asked why she filed a domestic violence complaint alleging K.R. held a knife to her throat just two days before the FRO hearing,[2] J.H. responded: "To show the

---

[2] The record of the FRO hearing shows J.H. waited twenty-five days to file her domestic violence complaint against K.R. Furthermore, although the appellate record does not include a copy of J.H.'s complaint, in the course of delivering his decision to dismiss the complaint, the judge noted that J.H. alleged the predicate act of simple assault, a disorderly persons offense, N.J.S.A. 2C:12-1a(1), (2), and (3), and the petty disorderly persons offense of harassment, N.J.S.A. 2C:33-4.

A-2668-17T2

[c]ourt what had happened. Because, again, the . . . officers did not ask my side of the story, at all."

Against this factual backdrop, the judge found K.R.'s testimony more credible than J.H.'s testimony. The judge found, by a preponderance of the evidence, that J.H. committed the domestic violence offense of simple assault against K.R. Guided by this court's two-prong paradigm in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006), the judge found, by a preponderance of the evidence, that K.R. was the victim of an act of domestic violence perpetrated by J.H. The judge also found the record developed at trial contained sufficient evidence to conclude the issuance of a FRO was necessary to prevent further abuse.

For the first time on appeal, J.H. argues that she was not afforded an opportunity to obtain counsel and was not advised of the consequences of a final restraining order. J.H. relies on this court's decision in D.N. v. K.M., 429 N.J. Super. 592 (App. Div. 2013), which, after denying certification, our Supreme Court emphasized that "[c]onsistent with current law, the Appellate Division concluded that 'the protections of due process do not require the appointment of counsel for indigents presenting or defending a private party's civil domestic

violence action.'" D.N. v. K.M., 216 N.J. 587, 588 (2014) (quoting D.N., 429 N.J. Super. at 606). Of particular relevance here, the Court also noted:

> In any event, this case is not a good vehicle to embark on a constitutional analysis of the issue presented because, based on the record before us, petitioner did not assert that she was indigent or ask the trial court to appoint counsel to represent her. In a similar context in 2009, the Appellate Division declined to consider the right to appointment of counsel in connection with a final restraining order entered under the Act. Crespo v. Crespo, 408 N.J. Super. 25, 45 (App. Div. 2009), aff'd, 201 N.J. 207 (2010). The panel observed that "[t]he record does not reflect that defendant ever sought the appointment of counsel prior to or during the adjudication of this domestic violence matter. Accordingly, in the present setting, the issue is purely academic." Ibid. The same is true here.
>
> [D.N., 216 N.J. at 589 (alteration in original) (emphasis added).]

J.H. never requested the Family Part judge to adjourn the FRO hearing to permit her to consult with an attorney nor requested the court to appoint counsel to represent her because she was indigent. The record here also shows J.H. made a knowing decision to proceed without counsel. J.H.'s argument related to her self-defense claim lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2668-17T2